UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JOHANNA L. PIMENTEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  4:08CV1477 TIA |
| | ) | |
| ST. LOUIS PUBLIC SCHOOLS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant St. Louis Pubic Schools' Motion for Summary
Judgment.   (Docket No. 58).  Plaintiff filed a Memorandum in Opposition (Docket No. 64) and
Defendant  filed a Reply (Docket No. 67) thereto.  All matters are pending before the undersigned
United States Magistrate Judge, with the consent of the parties, pursuant to 28 U.S.C. § 636(c).

Plaintiff Johanna Pimentel ("Pimentel") filed a Third Amended Complaint against Defendant
St. Louis Public Schools ("District") alleging purported sexual harassment under Title VII of the Civil
Rights Act of 1964, 42 U.S.C. § 2000e et seq.  In her Third Amended Complaint, Pimentel alleges
that Dr. Stanley Engram ("Engram"), the principal of Central Visual and Performing Arts High
School  and one of her supervisors during her employment as a substitute teacher for the 2007-2008
school year, engaged in sexually harassing conduct towards her.

Pursuant to Rule 56(c), Federal Rules of Civil Procedure, a court may grant summary
judgment if the information before the court shows that there are no material issues of fact in dispute
and that the moving party is entitled to judgment as a matter of law.   Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 247 (1986).  The burden of proof is on the moving party to set forth the basis of
the motion, Celotex Corp. v. Citrate, 477 U.S. 317, 323 (1986), and the court must view all facts and

inferences in the light most favorable to the non-moving party, <u>Matsushita Elec. Indus. Co. v. Zenith</u> <u>Radio</u>, 475 U.S. 574, 587 (1986). Once the moving party shows there are no material issues of fact in dispute, the burden shifts to the adverse party to set forth facts showing there is a genuine issue for trial. <u>Id.</u> The non-moving party may not rest upon her pleadings, but must come forward with affidavits or other admissible evidence to rebut the motion. <u>Celotex</u>, 477 U.S. at 324.

Summary judgment is a harsh remedy and should not be granted unless the movant "has established [its] right to judgment with such clarity as to leave no room for controversy." <u>New</u> <u>England Mutual Life Ins. Co. v. Null</u>, 554 F.2d 896, 901 (8th Cir. 1977). The Eighth Circuit has noted, however, that "summary judgment can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." <u>City of Mt. Pleasant, Iowa v. Associated Elec. Coop., Inc.</u>, 838 F.2d 268, 273 (8th Cir. 1988).

At the onset, the undersigned addresses Defendant's Motion to Strike Affidavit of Plaintiff Johanna Pimentel (Docket No. 69). The District requests Pimentel's affidavit be stricken inasmuch as the affidavit contradicts her prior deposition testimony and contains self-serving statements which are of no probative value for purposes of summary judgment. As the Eighth Circuit Court of Appeals stated in <u>Popoalii c. Corr. Med, Servs.</u>, "[p]ost-deposition contradictory affidavits are admitted only when the prior deposition testimony shows confusion, and the subsequent affidavit helps explain the contradiction." 512 F.3d 488, 498 (8th Cir. 2008) (citation omitted). In <u>Popoalii</u>, the court affirmed the lower court's ruling which granted a motion to strike the affidavit of an expert filed after the close of discovery. The <u>Popoalii</u> court reasoned that "[i]f testimony under oath ... can be abandoned many months later by the filing of an affidavit, probably no cases would be appropriate for summary

judgment. A party should not be allowed to create issues of credibility by contradicting his own earlier testimony." Id. (quoting Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1365 (8th Cir. 1983)). The court found that the initial testimony that the expert did not know the cause of plaintiff's blindness was inconsistent with the subsequent affidavit indicating that the defendants could have prevented the blindness. Popoalii, 512 F.3d at 499. The fact that the affidavit was not merely supplemental but was contradictory thus warranted striking the affidavit. Id. Nonetheless, the court must exercise extreme caution and articulate with care its reasons for finding an affidavit contradictory of earlier testimony. Mountain Pure, LLC v. Bank of America, N.A., 481 F.3d 573, 577 (8th Cir. 2007). This is because a court should not strike a post-deposition affidavit that "simply restates information already contained in deposition testimony or elaborates on information already conveyed," Popoalii, 512 F.3d at 498, that does not actually contradict the affiant's earlier testimony, that includes statements "that [the affiant] was confused in [the earlier] deposition or where the affiant needs to explain portions of [the earlier] deposition testimony that were unclear." City of St. Joseph, Mo. v. Southwestern Bell Tel., 439 F.3d 468, 476 (8th Cir. 2006); accord Brannon v. Luco Mop Co., 521 F.3d 843, 847 (8th Cir. 2008) (district court properly denied motion to strike an affidavit that contained inconsistencies that clarified, rather than contradicted, prior deposition testimony).

The District contends that the averments set forth in paragraphs 4, 8, 13, 14, 15, 16, and 17 contradict with Pimentel's deposition testimony and should be stricken. Pimentel counters that the challenged portions of the affidavit do not contradict her earlier deposition testimony of July 16, 2010. At her deposition, Pimentel testified that she happened to run into Engram in the hallway, and she shared her disagreement about her classroom management and concerns of unprofessional behavior regarding another teacher as they walked up the stairs and entered his office and continued

the conversation. (Pltf.'s Depo. at 151-52). In paragraph 4 of her affidavit submitted in Response, Pimentel attests that "In late January 2008, I had an opportunity to talk to Principal Engram in the school hallway between periods in which I mentioned my concern about recent criticism by Central VPA instructional coach Tina Hamilton. Principal Engram invited me to his office to further discuss my concerns." (Pltf.'s Aff. at ¶ 4). At her deposition, Pimentel did not testify that Engram invited her into his office but that they entered his office and continued a conversation. (Pltf.'s Depo. at 151-52). In paragraph 8, Pimentel opined that "I thought this would be a professional meeting between principal and teacher to discuss work." In comparison, Pimentel's deposition testimony is in contradiction in that Pimentel never testified that she viewed the dinner invitation as a professional meeting. (Pltf.'s Depo. at 157-59). In paragraph 13, Pimentel opined that "each time we met, I would ask him about the status of [my] TAC application." In comparison, Pimentel in her deposition testified that after her TAC had been rejected, she and Engram discussed her TAC application on one occasion. (Pltf.'s Depo. at 236, 244). In paragraph 14, Pimentel opined that "at the end of each meeting, when I attempted to leave his office, Principal Engram would block the closed door and ask me if he could have a hug or a kiss." In comparison, Pimentel testified in her deposition that on other occasions when leaving Engram's office, nothing offensive happened. (Pltf.'s Depo. at 159-60, 171). In paragraph 15, Pimentel averred that "I tried to push him away ... when he attempted to hug, kiss or touch me." In comparison, Pimentel testified in her deposition that on one occasion, Engram asked for a hug and she gave him a hug, on one occasion she let Engram hug her and kiss her cheek, and on another occasion she let him kiss her, hug her and touch her, her butt, and thighs, without objection. (Pltf.'s Depo. at 173, 183-84, 268). In paragraph 16, Pimentel averred that "the visits to Principal Engram's office would end in Principal Engram trying to hug and kiss me, and he also began

to touch me on my legs, buttocks and breasts before I could leave his office."  In comparison, Pimentel's deposition testimony noted on three occasions when leaving Engram's office, nothing offensive occurred.  (Pltf.'s Depo. at 159-60, 171).  In paragraph 17, Pimentel averred that she "tried to avoid Principal Engram."  In comparison, Pimentel testified that she tried to avoid going to Engram's office and that she voluntarily went to dinner with Engram twice during the summer. (Pltf.'s Depo. at 256-57, 260, 262, 273-74).

Upon review of Pimentel's deposition testimony and her subsequent affidavit, the undersigned finds Pimentel's deposition testimony and the averments set forth in paragraphs 4, 8, 13, 14, 15, 16, and 17 to be inconsistent.  Because there appears to be no confusion in the deposition, nor explanation provided for the affidavit's inconsistency, the portions of the affidavit in which Pimentel averments contradict her deposition testimony will not be considered, in itself, to create a genuine issue of material fact to avoid summary judgment.  <u>Schiernbeck v. Davis</u>, 143 F.3d 434, 438-39 (8th Cir. 1998).

## <u>The Undisputed Evidence before the Court on the Motion</u>

Viewing all facts and drawing all reasonable inferences in the light most favorable of the nonmoving party, <u>A. Brod, Inc. v. SK & I Co., L.L.C.</u>, 998 F. Supp. 314, 320 (S.D.N.Y. 1998) the Court sets forth the following facts:

### 1. Background

The Central Visual and Performing Arts High School (hereinafter "Central VPA") is one of the high schools within the St. Louis Public School District.  (Pltf.'s Third Am. Compl., Docket No. 39, at ¶ 2).  During the 2007-2008 school year, Pimentel worked at Central CPA as a substitute teacher earning $93.00 a day and receiving no benefits.  (<u>Id.</u> at ¶¶ 3, 5).  Dr. Stanley Engram

("Engram") was the principal at the school and was one of her supervisors during her employment. (Id. at 4).

The following individuals worked at Central VPA during the relevant times: Montrell Nash ("Nash") as an in-school suspension monitor (Nash Depo. at 16); Danny Flowers ("Flowers") as a social studies teacher  (Flowers Depo. at 8-9); Donna Watson ("Watson") as the secretary to the principal  (Watson Depo. at 8); and Karen Luchan as the main office clerk and clerk typist (Luchan Depo. at 7).  Sharonica Hardin ("Hardin") was the Chief Human Resources Officer of the District at all relevant times.  (Hardin Depo. at 8-9).

Sharaya Williams-James is Pimentel's mother.  (Williams Depo. at 7).

Pimentel learned that if she secured a Temporary Authorization Certificate (hereinafter "TAC") she would become eligible for employment full-time plus benefits such as health insurance. (Pltf.'s Third Am. Compl. at ¶ 6).  Pimentel discussed with Engram her future at Central VPA and her desire to be hired as a full-time teacher in late January 2008.  (Pltf.'s Depo. at 154).  Pimentel testified that during that conversation Engram indicated that he could assist her in obtaining her TAC. (Id.).  Engram explained to Pimentel if she obtained her TAC, she could qualify for a permanent position teaching social studies that would be open during the following school year.  (Engram Depo. at 111).  Pimentel downloaded the TAC application from the DESE website, completed the document, obtained Engram's signature, and submitted the completed TAC to DESE in February 2008. (Pltf.'s Depo. at 63-64,156-60).  Pimentel testified that DESE returned her TAC application on approximately February 28, 2008, with a note attached, apprising her that the application had been rejected due to a wrong signature, and that she needed to obtain the signature from someone in the Human Resources Department.  (Id. at 170, 174, 178-79).  Pimentel read in her deposition the note

attached to her TAC application: "We are unable to accept the signature of a building principal....

Section III of the Application for Temporary Authorization Certificate must be completed by the

Human Resources officer located at the St. Louis Public Schools' central office. We are unable to

accept the signature of a building principal. Thank you." (Id. at 67-68). Pimentel acknowledged that

in February 2008 Engram's signature was not the correct signature for the TAC application. (Id. at

63-64, 72). Indeed, Pimentel testified that the note attached to the TAC prompted her to call DESE,

and she spoke to a person who explained to her that she needed to obtain the signature from someone

in the District's Human Resources Department. (Id. at 67-68).

The District maintained a written policy and regulation which prohibited all forms of sexual

harassment. (Hardin Decl. at ¶¶ 4-5, Tabs A and B). The District's sexual harassment policy and

regulation forbid sexual harassment and directed employees who believed that they have been or are

being subjected to sexually harassing acts or conduct to immediately notify the human resources

officer, deputy superintendent, or their designees. (Id. at ¶ 7, Tabs A and B).

Pimentel did not make any complaints of the alleged sexual harassment to Human Resources

and any supervisor or manager for the District prior to the meeting on September 3, 2008. (Pltf.'s

Depo. 105-08). Pimentel testified in her deposition that she told Nash, Flowers, and her mother of

the alleged sexual harassment before September 3, 2008. (Id. at 109). Pimentel acknowledged that

it was against the District's policy to sexually harass someone. (Id. at 112). Pimentel testified that

the District's Human Resources Department accepted employee complaints of sexual harassment.

(Id. at 114). Plaintiff acknowledged that she understood retaliating and terminating someone for

complaining of sexual harassment is illegal. (Id. at 116).

The District has an Acceptable Use Policy governing the computer systems and setting

guidelines for responsibilities and obligations for an employee's use of the District's computer system. (Hardin Decl. at ¶ 9, Tab C; Hardin Depo. at 31-32).

### 2. Pimentel's Allegations of Sexual Harassment

Pimentel testified that sometime between January 23 and February 7, 2008, Engram invited her to dinner while she was in his office discussing her TAC and also offered her a ride home from work. (Pltf.'s Depo. at 157-58, 208). Pimentel did not construe his invitation to dinner to be sexually harassing at that time. (Id. at 158). Pimentel accepted the dinner invitation but they never scheduled a date or location for dinner. (Id.) About one week after Engram invited her to dinner, he called her on her cell phone after 8:00 p.m. to discuss an issue Pimentel was having with another co-worker about her work performance, and during this conversation, Engram might have mentioned going to dinner. (Id. at 160-61). The phone call offended Pimentel primarily because the call occurred late in the evening, and she felt that the conversation could have waited until the next day at work. (Id. at 165).

Pimentel testified that when she was called to Engram's office, Watson usually called her, not Engram personally. (Pltf.'s Depo. at 209). Watson worked outside of Engram's office and testified that she only recalled Pimentel being in the office to see Engram one time during the spring semester of the 2007-2008 school year, to address the issue of children hanging out of the window. (Watson Depo. at 34). About eighty percent of the time, Watson indicated that more than one person would be waiting in the office for her attention, and sometimes she would seek assistance from a teacher assistant or student workers answering the phones. (Id. at 37). Luchan also worked outside of Engram's office and testified that she only recalled Pimentel being in the office to see Engram one time but that she would see Pimentel on a regular basis when she would come into the main office

every day to sign-in and sign out as required of staff members. (Luchan Depo. at 8, 18-19).

Pimentel testified that sometime before February 28, 2008, she was called to Engram's office concerning a prior conversation between herself, Engram and another co-worker, and as she was leaving the office, Engram asked her for a hug. (Pltf.'s Depo. at 170-73). The hug lasted two to three seconds , and Engram touched her thigh as he hugged Pimentel. (Id. at173-75). Pimentel testified that she did not tell Engram that she felt uncomfortable giving him a hug, and she did not tell anyone, including Flowers and Nash, about the hug incident. (Id. at 175).

Pimentel testified at the end of February or beginning of March, 2008, she was in Engram's office discussing the signature issue of her TAC and when she started to leave, Engram asked for a hug and a kiss. (Pltf.'s Depo. at 181-84). Pimentel testified that she turned her head as Engram tried to kiss her, and as a result, he kissed her cheek. (Id. at 184-85). Pimentel testified that she did not say anything to Engram about his actions being unacceptable or wrong. (Id. at 185).

Pimentel testified that sometime in March 2008, Watson called her to Engram's office to address a parent complaint. (Pltf.'s Depo. at 208-10). According to Pimentel, Engram asked her to dinner, and Pimentel responded that she does not mix business with pleasure. (Id. at 210). As she left his office, Engram tried to hug and kiss her, and he grabbed her butt and pulled her body close to his, and then Pimentel told him she was not interested. (Id. at 212-13, 216). Even though Pimentel testified that she did not want Engram to hug her, Engram would follow her to the door and hug her. (Id. at 214). Pimentel testified that the incident lasted twenty seconds. (Id. at 216, 219). Although Pimentel testified that she rejected Engram's advances, she testified that "he still did what he was going to do." (Id.). After trying to stop Engram, she testified that she allowed him to do what he was doing, touching her body and trying to kiss her. (Id. at 216-17). Pimentel testified that

she was very offended after this incident, because she told Engram she was not interested but he continued to touch her.  (Id. at 220).

According to Pimentel, Watson called her to Engram's office in March 2008 to discuss a professional development workshop. (Pltf.'s Depo. at 220).  As she started to leave his office, Pimentel testified that Engram tried to touch her body, hug her and kiss her.  (Id. at 224).  As Engram tried to kiss Pimentel, she testified that she told him she was not interested.  (Id.).  Pimentel testified that she did not remember her exact words but that she rejected Engram.  (Id. at 225).  Because she wanted to leave, Pimentel testified that she allowed Engram to hug her, put his arms around her, and kiss her cheek and neck.  (Id. at 226-27).  Pimentel testified that the incident lasted twenty seconds. (Id. at 219).  Although Pimentel testified that she tried to stop Engram, part of the time he was hugging and touching her, she was not pushing away.  (Id.).  In her deposition, Pimentel offered no testimony that she told Engram she was offended by his conduct.  (Id. at 219-27).

Pimentel testified that sometime before April 17, 2008, Watson called her to Engram's office to discuss her leaving school early.  (Pltf.'s Depo. at 232).  When she started to leave Engram's office, he without asking Pimentel tried to hug and kiss her and grab Pimentel's breasts by placing his hand inside her shirt.  (Id. at 236, 239, 241).  Pimentel testified that she tried moving Engram's hands away from her and tried to push him back.  (Id. at 240).

According to Pimentel, Watson called her into Engram's office in May 2008, and as she started to leave, Engram was all over her forcefully feeling her breasts and sucking her nipples even though she tried to push him away.  (Pltf.'s Depo. at 244, 246-48).  Pimentel testified that after a while she just let him suck her breasts so that Engram would get off of her.  (Id. at 247).  Pimentel testified that the incident lasted twenty seconds, and she was very upset and almost in tears.  (Id. at

247-48). Although Watson who sat directly outside Engram's office testified that she never saw Pimentel leaving Engram's office upset, Watson did not recall calling Pimentel to the office to address a dress code violation or problems with her leaving early or to discuss her TAC. (Watson Depo. at 39, 45).

In early July 2008, Pimentel testified that she accepted Engram's dinner invitation to Joe's Crab Shack to make sure he was still on the same track with respect to her TAC. (Pltf.'s Depo. at 257). Pimentel testified that she allowed Engram to pick her up for dinner at her house and treat her to dinner at Joe's Crab Shack. (Id. at 260-62). Pimentel did not view the dinner as a date but as business, although she acknowledged Engram maybe considered the dinner to be a date. (Id. at 263). Pimentel testified that she did not see a problem with letting Engram pick her up and take her out to dinner. (Id. at 261). According Pimentel, they talked about her TAC during the dinner. (Id. at 264). Pimentel testified that, after dinner, Engram stopped at a Hampton Inn and asked Pimentel to go inside the hotel and get a rate for a room. (Id. at 265-66). Pimentel testified although she thought Engram wanted her to go to the room with him, without expressing any concern or question, she entered the Hampton Inn, obtained a room rate, returned to the car, and told Engram that a room cost $89 to $100. (Id. at 266-67). Pimentel testified that Engram told her she could just take the money, because he did not want to get a room. (Id. at 267). Pimentel testified that Engram drove her back to her house and while in the car, she allowed Engram to kiss her, hug her, and touch her buttocks and thigh. (Id. at 268). The incident lasted about two minutes and then she invited Engram into her house to see the damaged window that she was going to fix with the money he allowed her to keep. (Id. at 269). After showing Engram the window, Pimentel testified that she chose to escort Engram to his car. (Id. at 270-71). Pimentel testified that she kept the money and used it to fix the broken

window in her home.  (Id. at 267, 271).

On August 5 or 6, 2008, Engram asked Pimentel to dinner, and she accepted.  (Pltf.'s Depo. at 273-74).  Engram picked Pimentel up at her mother's house and took her to Applebee's for dinner. (Id.).  Pimentel testified that Engram ordered a drink and she ordered water, but they left the restaurant before ordering dinner after seeing a student.  (Id. at 276-79).  Without discussing the destination, Engram drove Pimentel to his house.  (Id. at 279-80).  After finding out they were going to Engram's house, Pimentel did not say she did not want to go to his house.  (Id. at 280).  After showing Pimentel around his house, Engram entered his bedroom and asked her if she would like anything to drink.  (Id. at 280-81).  Pimentel acknowledged that she did not tell Engram that she did not want to go to his house or into his bedroom.  (Id. at 282).  After returning with the drinks and sitting next to her on the bed, Pimentel testified that Engram removed his shirt and asked for a massage and asked why she would not have sex with him.  (Id. at 281-82).  Pimentel testified that when Engram removed his shirt she "knew at this point that [she] was going to have to tell him that it's not like that."  (Id. at 281).  Pimentel testified that she explained to Engram that she does not mix business with pleasure and that she was not interested, and he was too old.  (Id. 283).  According to Pimentel,  Engram jumped up, put his shirt on, and drove Pimentel back to her mother's house.  (Id. at 284).

Two days after the Applebee's incident, Pimentel testified that Engram called her and apologized, and he asked if there was anything she needed.  (Pltf.'s Depo. at 287).  Pimentel told Engram that she needed money to purchase her daughter's school shoes.  (Id.).  According to Pimentel, a day or two later, she met Engram at a Quick Trip, and he gave her a $100 for her daughter's shoes.  (Id. at 287-88).

From April through August 2008, Pimentel called Engram's cell phone number approximately forty times, and Engram called Pimentel's cell phone number approximately twenty-nine times. (Exh. 10).

### 3. Pimentel's Violation of the District's Acceptable Use Policy and Suspension

On August 25, 2008, Pimentel and Nash engaged in an email exchange using the District's email system wherein both used profanity. (Pltf.'s Depo. at 87, 91; Exh. C). Both Pimentel and Nash received letters dated August 27, 2008 from Hardin apprising them of their suspension pending an investigation into the incident involving inappropriate and unprofessional conduct through the District's email system and requesting that they meet with Hardin on September 3, 2008. (Pltf.'s Depo. at 98-99; Exh. D).

On September 2, 2008, Pimentel filed out an EEOC intake questionnaire setting forth her allegations of sexual harassment against Engram. (Pltf.'s Depo. at 141-42; Exh. H).

At the September 3, 2008 meeting, Pimentel admitted sending the inappropriate email and that the email was improper because of the inappropriate language. (Pltf.'s Depo. at 101-02). Pimentel also acknowledged that the District's actions taken against her were because of the inappropriate email. (Id.). At the meeting and in a letter dated September 3, 2008, Hardin apprised Pimentel that the District would not use her as a substitute teacher for the 2008-2009 school year as a result of her inappropriate use of the District's email system. (Id. at 102, 119-20; Exh. E). Hardin's decision to make Pimentel ineligible for substitute teaching assignments for the 2008-2009 school year was based solely on her inappropriate use of the District's email system and was made before Pimentel informed Hardin of her allegations of sexual harassment against Engram. (Hardin Decl. at ¶¶ 14-16). The decision to remove Pimentel from the District's substitute teacher list for one year was solely Hardin's

decision without consulting Engram.  (Id.).

### 4.  Pimentel's Reporting to the District the Alleged Harassment

At the September 3, 2008 meeting, after being apprised that she would not be eligible for substitute teaching assignments for the 2008-2009 school year, Pimentel reported to Hardin that she had been sexually harassed by Engram.  (Pltf.'s Depo. at 105-06; Hardin Depo. at 45).  Hardin told her that she wanted to investigate Pimentel's allegations and asked her to write a specific complaint regarding her allegations of sexual harassment.  (Pltf.'s Depo. at 132, 136).  Pimentel did not provide Hardin with a written complaint regarding her allegations of sexual harassment as requested,  because Pimentel testified that Hardin would receive her complaint filed with the EEOC.  (Id. at 136).  In a letter dated September 3, 2008, Hardin noted how Pimentel reported to the District an allegation of sexual harassment and pending receipt of her formal written complaint, she requested to meet with Pimentel on September 9 at 11:00 a.m. to discuss her allegations of sexual harassment.  (Id. at 133-34; Exh. F).  Although Pimentel understood from the letter that Hardin was asking her to provide a formal written complaint, Pimentel testified that she was submitting a formal written complaint in her suit that she filed.  (Pltf.'s Depo. at 135).  Pimentel did not show up for the September 9, 2008 meeting to discuss her allegations of sexual harassment with Hardin, because she has already filed her complaint with the EEOC and was "done talking with the St. Louis Public Schools, Dr. Engram or anyone else there."  (Id. at 134-35).

Prior to the September 3 meeting, Pimentel had never reported to the Human Resources office, the Superintendent's office, anyone at the District's central office, or any supervisor or manager that she had been sexually harassed by Engram.  (Pltf.'s Depo. at 107-09).  Pimentel acknowledged that she could have reported to the Human Resources Department or one of Engram's

bosses that she was being sexually harassed, but she chose not to do so because she did not want to get fired. (Id. at 114-15). Pimentel acknowledged that she understood that it is illegal for someone to retaliate against another person because the person complained of sexual harassment. (Id. at 116).

Pimentel testified that the only employees at the District she told about being sexually harassed prior to September 3, 2008 were Flowers and Nash. (Pltf.'s Depo. at 109). Flowers testified that he does not remember Pimentel telling him Engram tried to touch her, but he remembered Pimentel telling him that Engram really liked her, and she was not interested. (Flowers Depo. at 24). Pimentel testified that after Nash found out about his suspension because of the inappropriate email, he came to her house and she told him about the Applebee's dinner and everything that happened between her and Engram during the past semester. (Pltf.'s Depo. at 289-90). Nash testified that Pimentel did not share with him the details of her relationship with Engram during the spring of 2008 or the Applebee's dinner. (Nash Depo. at 151). Nash further testified that he "had already decided in my – in my head that both of them are telling a gang full of lies." (Id. at 107).

Pimentel testified that told her mother about every incident with Engram the day the incident occurred. (Pltf.'s Depo. at 230). Williams-James testified that Pimentel reported to her three inappropriate interactions involving Engram. (Williams-James Depo. at 65). First, in February or March 2008 while in Engram's office, he kissed Pimentel on the cheek and placed his hand on the door to prevent her from leaving his office. (Id. at 66). Next, in the spring of 2008, Engram patted Pimentel's butt and she told him, "Don't." (Id. at 50, 67). Williams-James testified the last incident was the Applebee's dinner when Engram picked up from her house, and Pimentel discussed the status of her teaching certificate (Id. at 64, 68-69). Williams-James testified that after dinner, they drove

to Engram's house, and he indicated that he wanted to be intimate or have sexual relations with Pimentel.  (Id. at 69).  Williams-James testified that she urged Pimentel two times that she needed to tell someone about Engram's actions and even encouraged her to report him to the Board of Education and the Superintendent.  (Id. at 45, 50, 53-54, 69-70).  Williams-James testified that she might have urged Pimentel to go the human resources office.  (Id. at 45).

In a letter dated September 29, 2008, Kelli Thompson, Employee Relations Assistant for the District, apprised Pimentel that the District had received her EEOC Charge of Discrimination, wanted to speak with her concerning her allegations of sexual harassment, and requested that she call the District to schedule a time to meet with Hardin.  (Pltf.'s Depo. at 138; Exh. G).  Pimentel never called the District to schedule a date and time to meet to discuss her allegations of sexual harassment.  (Pltf.'s Depo. at 138).  Pimentel testified that she never responded to the District's request to meet and provide information regarding her allegations of sexual harassment inasmuch as far as she was concerned, the next time she would be speaking with the District would be through an attorney, and any formal written statement would be coming from her attorney.  (Id. at 136-37).  Pimentel testified that once she received her TAC, she planned on reporting Engram for sexual harassment.  (Id. at 258).  Pimentel opined that she believed once she reported Engram, she would hope that the sexual harassment would stop.  (Id. at 258-59).  Pimentel testified that even after everything that had occurred between her and Engram, she still wanted to work at Central VPA with Engram so long as the sexual harassment and visits to his office did not continue.  (Id. at 257-58).

### 5. Pimentel's Charges and Complaints of the Sexual Harassment

On September 8, 2008, Pimentel filed her Charge of Discrimination with the EEOC.  (Pltf.'s Third Am. Compl., Docket No. 39, at ¶ 19; Exhibit 1).  In the Charge, Pimentel set forth the

particulars of her discrimination claim as follows:

> I. I was hired by the St. Louis Public Schools as a Substitute Teacher in November 2004. In January 2008, I took a position as a Continuing Substitute at Central VPA School. While employed at the school I was sexually harassed by the school principal, Dr. Stanley Engram. Dr. Engram would ask me out on dates, ask me to hug or kiss him, tried to grab at my breasts and asked me why I would not sleep with him. I made it clear to Dr. Engram that I was not interested in this kind of relationship with him. I was terminated from my position on September 3, 2008.

> II. I was informed that I was being terminated due to inappropriate use of the school's email system.

> III. I believe that I have been discriminated against by being sexually harassed and discharged on the basis of my sex, female, in violation of Title VII of the Civil Rights Act of 1964, as amended.

(Id.).

On September 16, 2008, Pimentel received a right to sue letter from the EEOC. (Id. at ¶ 20; Exhibit 2).

On September 25, 2008, Pimentel filed her original pro se Complaint alleging sexual harassment and requesting damages in the amount of a new teacher's salary as well as punitive damages "for misleading representation fraudulently." (Pltf.'s Compl., Docket No. 1, at ¶¶ 10, 13). In relevant part, Pimentel alleges that she met with Dr. Engram on three occasions in February 2008, to discuss work related issues and during the meetings, Dr. Engram invited her to dinner, requested a hug, and offered her a ride home from work. (Id. at 8). Pimentel declined Dr. Engram's offers and reminded him of the signature needed for completion of the TAC. (Id.). In March 2008, Pimentel alleges that Dr. Engram invited her to dinner and in the last meeting, Pimentel apprised Dr. Engram that she does not mix business with pleasure, and Dr. Engram attempted to hug and touch her body as she left his office. (Id.). During the other visit, Pimentel alleges that Dr. Engram attempted to kiss

her, and she told him she was not interested. (Id.). Pimentel alleges that she shared these incidents

with Flowers and Nash. (Id.). In May 2008, Pimentel alleges that Dr. Engram fondled her breasts.

(Id.). During the summer, Pimentel alleges she had dinner with Dr. Engram at Applebee's, and Dr.

Engram propositioned Plaintiff for sex. (Id.). Pimentel alleges that she met with Dr. Engram after

the 2008-09 school year started to discuss her teaching position with the District. (Id.). Pimentel

contends that she threatened to report him to Hardin, and he responded if she wanted longevity with

the District, she would not tell Hardin about the Applebee's dinner. (Id.).

On December 30, 2009, Pimentel filed a Third Amended Complaint alleging sexual

harassment. Pimentel alleges in the supplemental pleading the following incidents of sexual advances

made by Dr. Engram:

> From February 2008 through June 2008, Engram summoned Plaintiff to his
> office many times and tried to solicit sexual favors from her, attempted to touch her
> buttocks or breasts, and tried to kiss her. Each time, she pushed him away and told
> him "no."

\*\*\*

> During the summer of 2008, Engram repeatedly attempted to contact Plaintiff
> to take her to dinner to discuss the TAC application, and because Plaintiff needed the
> additional benefits and higher pay for her family, she finally agreed to a dinner with
> Engram.

> On August 5, 2008, Engram took Plaintiff to Applebee's for dinner and during
> the car ride to Plaintiff's house, Engram asked Plaintiff to have sex with him. Again,
> Plaintiff refused.

\*\*\*

> Engram's sexually harassing conduct toward Plaintiff from February 2008 to
> August 2008 unreasonably interfered with Plaintiff's employment and work
> performance; and created an intimidating and hostile work environment for Plaintiff
> as Central VPA.

(Pltf.'s Third Am. Compl., Docket No. 39, at ¶¶ 10, 12, 13, 15).

**Discussion**

"Title VII prohibits employers from discriminating based on sex with respect to compensation, terms, conditions, or privileges of employment." Jenkins v. Winter, 540 F.3d 742, 748 (8th Cir. 2008). "Discrimination based on sex that creates a hostile or abusive working environment violates Title VII." Id. at 748 (citing Brenneman v. Famous Dave's of Am., Inc., 507 F.3d 1139, 1143 (8th Cir. 2007)) , quoting Weger v. City of Ladue, 500 F.3d 710, 718 (8th Cir. 2007). "A hostile work environment arises when sexual conduct has the purpose or effect of unreasonably interfering with an individual's work performance, or creating an intimidating, hostile, or offensive working environment." Anda v. Wickes Furniture Co., Inc., 517 F.3d 526, 531 (8th Cir. 2008) (citation omitted).

To establish a *prima facie* case of hostile work environment in an action involving supervisor harassment, a plaintiff must prove that: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; and (4) the harassment affected a term, condition, or privilege of employment. Jenkins, 540 F.3d at 748-49. "If a prima facie case is shown, the employer is vicariously liable unless it demonstrates that it is entitled to the Ellerth-Faragher affirmative defense. Id. (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998) and Faragher v. City of Boca Raton, 524 U.S. 775 (1998)). "The [Ellerth-Faragher] defense has two elements: (1) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) the employee unreasonably failed to take advantage of any preventative or corrective opportunities by the employer or to otherwise avoid harm." Jenkins v. Winter, 540 F.3d 742, 750-51 (8th Cir. 2008).

In this case, Pimentel asserts a supervisor sexual harassment claim against the District based

on alleged conduct by Engram. The parties do not dispute that Pimentel belongs to a protected class or that the alleged harassment was based on sex. However, the District contends that Pimentel has failed to produce sufficient evidence to establish the second and fourth elements.

With respect to the second element, the "subject to unwelcome harassment," that Pimentel was subjected to unwelcome harassment in the form of sexual advances or requests for sexual favors requires that the "conduct at issue must be 'unwelcome' in that the plaintiff neither solicited it nor invited it and regarded the conduct as undesirable or offensive." Scusa v. Nestle U.S.A., Co., Inc., 181 F.3d 958, 966 (8th Cir. 1999). "The proper inquiry is whether the plaintiff indicated by [her] conduct that the alleged harassment was unwelcome." Quick v. Donaldson Co., 90 F.3d 1372, 1377 (8th Cir. 1996).

As the Court stated in Meritor Savings Bank v. Vinson, 477 U.S. 57, 68 (1986), the "gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'" A plaintiff's words or acts may, in some circumstances, suggest that sexual comments are welcome, but "the question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact...." Id. A plaintiff must indicate by her conduct that the harassment was unwelcome, and evidence that she "engaged in behavior similar to that which she claimed was unwelcome or offensive" is evidence that the behavior is not unwelcome. Scusa, 181 F.3d at 966.

Here, Pimentel's own conduct and testimony demonstrate that she did not find the alleged harassment unwelcome. Indeed, Pimentel testified that she allowed Engram to kiss her, hug her and touch her without objection on a number of occasions; she voluntarily went out to dinner with Engram on two occasions after the school year ended; she allowed Engram to pick her up from her

house and her mother's house and pay for the dinners; she accepted cash gifts from Engram on two occasions; she voluntarily entered a hotel to check the room rate per nigth; she invited Engram into her home; she called Engram's cell phone approximately forty times from April to August 2008; and she voluntarily entered Engram's house and then his bedroom and sat on his bed and accepted a drink. Moreover, Pimentel failed to complain about any of the alleged incidents of sexual harassment despite her awareness of her employer's sexual harassment policy. The unrefuted record shows that Pimentel failed to provide evidence "that she considered herself subject to unwelcome sexual harassment" prior to the first time she complained of the alleged harassment during the September 3, 2008 meeting. See Faragher 524 U.S. at 787 (complainant must show sexual harassment objectively and subjectively offensive). Despite being aware of the District's policy prohibiting sexual harassment, the record shows that Pimentel never complained about any incidents of sexual harassment . Pimentel's failure to complain about any of the alleged incidents of sexual harassment shows that she failed to consider herself subject to unwelcome sexual harassment prior to September 3, 2008. Stuart v. Gen. Motors Corp., 217 F.3d 621, 632 (8th Cir. 2000). Therefore, the Court finds that no reasonable jury could find that Pimentel "by her conduct indicated that the alleged sexual advances were unwelcome." Meritor, 477 U.S. at 68.

The Court finds that Plaintiff has also failed to present evidence sufficient to establish the fourth element of her prima facie case. To establish this element, a plaintiff "must demonstrate the unwelcome harassment was sufficiently severe and pervasive as to affect a term, condition, or privilege of employment by creating an objectively hostile or abusive environment." LeGrand v. Area Resources for Community and Human Servs., 394 F.3d 1098, 1101 (8th Cir. 2005). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment - an

environment that a reasonable person would find hostile or abusive - is beyond Title VII's purview." Duncan v. General Motors Corp., 300 F.3d 928, 934 (8th Cir. 2002)(quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). "In determining whether the conduct is sufficiently severe or pervasive, [the Court must examine] the totality of the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Duncan, 300 F.3d at 934 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)); see also Baker v. John Morrell & Co., 382 F.3d 816, 828 (8th Cir. 2004).

Here, the conduct attributed to Engram was infrequent, it was neither threatening or unwelcome, and there is no evidence that it unreasonably interfered with Pimentel's work. This finding is buttressed by Pimentel's admission that she would be willing to work for Engram at Central VPA the following school year. Although some of Engram's alleged conduct may have made Pimentel uncomfortable, in light of the demanding standards set by the Supreme Court and by Duncan and its progeny, "it cannot be said that it rises to the level of actionable hostile work environment sexual harassment." LeGrand, 394 F.3d at 1102.

For the above reasons, the Court concludes that the District is entitled to summary judgment on Pimentel's sexual harassment claim.

Assuming arguendo Pimentel established a prima facie case creating a genuine issue of material fact to overcome the District's motion for summary judgment, employers are subject to vicarious liability "for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Faragher, 524 U.S. at 807. The employer's strict liability for the acts of its supervisor may be avoided, however, in cases where the supervisor's

harassment does not result in a tangible employment action taken against the plaintiff-employee.  Id.

In *Faragher* and *Burlington Industries*, the Supreme Court set forth the contours of the affirmative

defense that an employer may raise in cases where an employee seeks to hold his or her employer

strictly liable for the acts of the employee's supervisor:

> When no tangible employment action is taken, a defending employer may raise an
> affirmative defense to liability or damages, subject to proof by a preponderance of the
> evidence.  The defense comprises two necessary elements: (a) that the employer
> exercised reasonable care to prevent and correct promptly any sexually harassing
> behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of
> any preventive or corrective opportunities provided by the employer or to avoid harm
> otherwise.

Faragher, 524 U.S. at 807; Burlington Indus., Inc., 524 U.S. at 765 (citations omitted).  Thus, in cases

such as the instant action, the Court must first determine whether the supervisor's conduct constitutes

a tangible employment action such that the employer is precluded from raising the affirmative defense

under *Faragher* and *Burlington Industries*.

As a general rule, a tangible employment action will typically occur in cases where the

supervisor, "acting with the authority of the company," makes an employment decision that "inflicts

direct economic harm" on the employee.  Burlington Indus., Inc., 524 U.S. at 761-62.  The Supreme

Court further opined:

> Tangible employment actions fall within the special province of the supervisor.  The
> supervisor has been empowered by the company as a distinct class of agent to make
> economic decisions affecting other employees under his or her control.  Tangible
> employment actions are the means by which the supervisor brings the official power
> of the enterprise to bear on subordinates.  A tangible employment decision requires
> an official act of the enterprise, a company act.

Id. at 762.

Such tangible employment action includes, *inter alia*, "a significant change in [the plaintiff-

employee's] employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Id. at 761; Faragher, 524 U.S. at 790 ("[T]here is nothing remarkable in the fact that claims against employers for discriminatory employment actions with tangible results, like hiring, firing, promotion, compensation, and work assignment, have resulted in employer liability once the discrimination was shown.") (citing Meritor Sav. Bank, 477 U.S. at 70-01) ("[C]ourts have consistently held employers liable for the discriminatory discharge of employees by supervisory personnel, whether or not the employer knew, should have known, or approved of the supervisor's actions.").

Based on the foregoing, the Court concludes that Hardin's decision to remove Pimentel from the substitute teaching assignment because of her email containing inappropriate language sent to a co-worker does not constitute a tangible employment action sufficient to bar the District from availing itself of the *Faragher/Burlington Indus.* affirmative defense. Indeed, Pimentel admitted that no connection existed between the alleged harassment by Engram and the District's decision that she be ineligible for substitute teaching assignments for the 2008-2009 school year. Hardin made the decision to make Pimentel ineligible and apprised her of this decision before Pimentel told Hardin that she had allegedly been sexually harassed by Engram. Likewise, the evidence before the undersigned shows that Pimentel failed to take advantage of the District's preventative and corrective opportunities offered by the District. Pimentel acknowledged that the District exercised reasonable care to prevent sexual harassment by having a sexual harassment policy, and she knew that it was against the District's policy to sexually harass someone. The District exercised reasonable care to promptly correct any sexually harassing conduct. Pimentel admitted that the first time she reported to anyone in the Human Resources office or the Superintendent's office that she was being sexually

harassed was at the September 3, 2008 meeting regarding her inappropriate use of the District's email system. Immediately after reporting her complaint of sexual harassment, Hardin told her she wanted to investigate her allegations and asked her to write a complaint regarding her allegations of harassment. Further, the District attempted to schedule meetings on September 9 and 29, 2008 with Pimentel regarding her allegations. Pimentel failed to avail herself of the District's preventive and corrective measures. See Duncan v. Gen. Motors Corp., 300 F.3d 928, 935 (8th Cir. 2002) (a reasonable employee has an obligation to give the employer a chance to work problems out). Finally, Pimentel waited eight months to make a complaint of harassment even though she acknowledged it was against the District's policy to sexually harass someone and understood that the Human Resources office accepted complaints of sexual harassment. Although Pimentel filed an EEOC Charge of Discrimination before apprising the District of her sexual harassment complaint, Pimentel failed to provide the District with the requested written complaint and failed to attend or contact the District with regard to the requested September 9 and 29 meetings with the Human Resources Department to discuss her allegations of harassment.

Accordingly, the District is entitled to summary judgment on the question of employer liability with respect to Pimentel's sexual harassment claim.

**IT IS HEREBY ORDERED** that Defendant's Motion to Strike Affidavit of Plaintiff Johanna Pimentel (Docket No. 69) is **GRANTED in part**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Docket No. 58) is **GRANTED**.

A separate Judgment in accordance with this Memorandum and Order is entered this same

date.

/s/ Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE

Dated this __14th__ day of January, 2011.